# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

JASON P. SAMPLE,

               **Case No. 6:14-cv-01112-ST**

    **Plaintiff,**         **FINDINGS AND**
                  **RECOMMENDATION**

v.

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

    **Defendant.**

STEWART, Magistrate Judge:

   Plaintiff, Jason P. Sample ("Sample"), seeks judicial review of the final decision by the

Commissioner of the Social Security Administration ("Commissioner") denying his applications

for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42

USC §§ 401-434, and Supplemental Security Income ("SSI") under Title XVI of the SSA, 42 USC

§§ 1381-1383f.   This court has jurisdiction to review the Commissioner's decision pursuant to 42

USC § 405(g) and § 1383(c)(3).   For the reasons set forth below, the Commissioner's decision

should be reversed and remanded for the calculation and payment of benefits.

1 – FINDINGS AND RECOMMENDATION

## ADMINISTRATIVE HISTORY

Sample protectively filed his applications on October 18, 2010, alleging a disability onset date of July 16, 2010.   Tr. 158-70.[1]   After his applications were denied initially and on reconsideration, a hearing was held on January 15, 2013, before an Administrative Law Judge ("ALJ"), John J. Madden, Jr.   Tr. 32-77.   The ALJ issued a decision on January 25, 2013, finding Sample not disabled.   Tr. 10-20.   Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.   20 CFR §§ 416.1481, 422.210.

## ALLEGED IMPAIRMENTS

Sample was 39 years old on his alleged onset date.   Tr. 158, 160.   He has a high school education and a year of training as a heavy equipment operator.   Tr. 380.   His past relevant work experience includes work as a retail clerk/cashier, security guard, and gas station attendant. Tr. 39, 72-73, 206-07.   Sample alleges he is unable to work due to the combined mental and physical impairments of severe depression, back pain, sleep apnea, and musculoskeletal issues involving his knees and ankles.   Tr. 205.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A).   The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.   20 CFR §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.

---

1   Citations are to the pages of the official transcript of the Administrative Record filed on November 18, 2014 (docket #11).

If so, the claimant is not disabled.    20 CFR §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.    20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c).    Absent a severe impairment, the claimant is not disabled.    *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.    20 CFR §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).    If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").    The RFC is an assessment of work-related activities that the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.    20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8P, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.    20 CFR §§ 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e).

If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy in view of the claimant's age, education, and work experience.    20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g); *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099.

The initial burden of establishing disability rests upon the claimant.    *Tackett*, 180 F3d at 1098.    If the process reaches step five, the burden shifts to the Commissioner to show that jobs

exist in the national economy within the claimant's RFC.   *Id*.   If the Commissioner meets this

burden, then the claimant is not disabled.   20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v)

& (g), 416.960(c).

## MEDICAL RECORDS

### I.  Before Onset Date

Most of the available medical records date from 2008 forward.   However, the record

reveals that since mid-2004 Sample has reported, been diagnosed with, and treated with injections

and medications for low back pain and also for knee, ankle, and foot pain.   Tr. 279-82.

Between 2001 and September 2006, Sample lived in Arizona and worked as a correctional

officer at a prison.   Tr. 177, 232.   On July 27, 2004, John De Angelis, M.D., L.I.C., a pain

management specialist, examined Sample.   Tr. 279-82.   Sample reported experiencing constant

sharp pain in his left buttocks, low, mid, and upper back beginning two years earlier.   Tr. 279.

The pain varied in intensity and was nine on a ten-point scale.   *Id*.   Procedures between

August 16 and October 12, 2004, confirmed a lumbar degenerative disc disease, lumbar facet

syndrome, and myofascial syndrome.   Tr. 272.   Sample achieved some pain relief with a series of

trigger point injections and facet denervations at L2-5.   *Id*.   Sample also reported a right ankle

injury dating to approximately mid-2004 that caused him circumferential pain thereafter.   Tr. 290.

In mid-2005, Sample reported a right knee injury diagnosed as tears to the meniscus and cruciate

ligament.   Tr. 283-86.

In September 2006, Sample lost his job at the prison and worked a for about a year at fairly

short-term jobs through the fall of 2007.   He then relocated to Florence, Oregon, and began

working as a security guard at the Three Rivers Casino.   Tr. 178, 232, 290, 380, 632.   On

March 11, 2008, Sample established care with PeaceHealth.   Tr. 632-24.   On June 30, 2008, an

4 – FINDINGS AND RECOMMENDATION

orthopedic examination revealed flexible pronated feet with possible posterior tibial tendon tear or partial tear.    Tr. 291.    X-rays showed no significant degenerative changes.    *Id.*

Over the next two years, Sample continued to experience pain in his low back, right ankle and arches of both feet which increased with standing and walking.    His back pain sometimes reached a level sufficiently severe that Sample sought medical attention in the emergency room. Tr. 375-76, 612.    His back pain was treated with epidural injections and various prescription medications, including Cymbalta (for chronic pain and neuropathy), MS Contin (long acting morphine), Vicodin (fast acting narcotic for breakthrough pain), Celebrex (NSAID), Flexeril and Methocarbamol (muscle relaxants).    Tr. 290, 296-301, 563, 586, 595, 609, 613, 616-17. However, Sample often could not afford the copays for the prescribed medications.    Tr. 563, 614-15.

Contemporaneously with his physical ailments, Sample has struggled with various mental impairments.    Multiple medical providers throughout the period leading up to the alleged onset date noted depression, anxiety, and anger management issues and prescribed medications including Citalopram, Wellbutrin, Effexor, Trazodone, and Pristiq.    Tr. 568, 573, 584, 586, 588, 590, 592, 614-15.    On April 1, 2008, Diane Mackey, L.P.C., diagnosed Sample with major depression and assessed a GAF of 45.[2]    Tr. 287.    She recommended counseling for anger control issues and depression.    Tr. 287-89.

The medical records between mid-2008 and April 2009 note ongoing depression and

---

2 The Diagnostic and Statistical Manual of Mental Disorders organizes each psychiatric diagnosis into five levels relating to different aspects of the disorder or disability.    American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 27-33 (4th ed., text rev., 2000) ("DSM-IV-TR").    Axis V is the Global Assessment of Functioning ("GAF") which reports the clinician's judgment of the individual's overall functioning.    *Id* at 32-33.    A GAF score of 41-50 indicates that the patient has "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)."    *Id* at 34.

5 – FINDINGS AND RECOMMENDATION

treatment with Wellbutrin (Tr. 598, 600, 605, 614-15, 617-19, 621), but focus primarily on Sample's ongoing physical impairments, including back pain, metabolic syndrome, hypertension, and morbid obesity.   On April 21, 2009, Sample reported back pain at an eight on a ten-point scale to Randy Boespflug, M.D.   Tr. 591.   He also reported increasing depression, anxiety, and anger, including symptoms of not wanting to get out of bed in the morning or be around people.   *Id*.   He had "no joy in life," had lost all interest in sexual activity, and rated his mental health status at a three on a ten-point scale.   Tr. 592.   Dr. Boespflug noted psychomotor retardation, a sad affect, and no eye contact.   *Id*.   He provided samples of Pristiq and encouraged weight loss, both to assist with Sample's physical impairments and depression control.   *Id*.

Dr. Boespflug continued to treat Sample from early May to mid-July 2009.   Tr. 583-590. By mid-May 2009, Sample's depression had lessened somewhat but "not to the point of control," prompting Dr. Boespflug to increase the dosage of his Trazodone and Citalopram.   Tr. 588. Sample's back pain continued at an eight on a ten-point scale.   Tr. 587.   A similar examination in mid-June 2009 resulted in another dosage increase in Sample's depression medications, the addition of Prednisone and Methocarbamol for muscle relaxation, and advice that Sample use heat, walk, recline and not sit too much.   Tr. 586.

Between July and September 2009, Sample received monthly treatment by PeaceHealth physicians for symptoms of depression, back pain, and pain in both knees, ankles, and hip joints. Tr. 580-84.   By August 2009, due to right knee swelling and reports of right knee pain and instability, Myo Naing, M.D., referred Sample to an orthopedic surgeon.   Tr. 582.

On September 11, 2009, Bruce Watanabe, M.D., an orthopedist, examined Sample for complaints of bilateral knee pain.   Tr. 303-05.   Still working at the casino, Sample had to be on his knees for 15-30 minutes at a time loading money into machines and had trouble rising from his

6 – FINDINGS AND RECOMMENDATION

knees.   Tr. 304.   Sometimes he felt like his knees wanted to hyperextend.   *Id.*   Dr. Watanabe's

impression of radiographs was medial compartment arthritis in both knees and varus deformity of

the proximal tibia in the right knee.   *Id.*   He concluded that Sample was not a candidate for knee

surgery and advised substantial weight loss, noting that Sample's knee problems would probably

progress unless he lost weight.   Tr. 305.

   In early January 2010, Sample reported less foot pain due to being off work for hernia

repair surgery.   Tr. 570.   However, he usually had to take the weight off the base of his feet after

walking for two hours.   *Id*.

   By early March 2010, Sample had apparently returned to work at the casino.   He was

taking a "moderate amount of morphine," using MS Contin twice daily when working and Vicodin

for short-term pain when bending to do money drops at the casino.   Tr. 567.   By early April 2010,

Sample had quit working at the casino and took a job as an assistant manager at a Dollar Tree

Store.   Tr. 232, 564, 567.   On April 7, 2010, Sample reported an "ongoing problem" of being

"barely able to climb the stairs" after standing at the cash register at work.   Tr. 565.   He was

using his arms to help himself up stairs.   *Id*.   Dr. Boespflug diagnosed Sample with improvement

to his chronic back pain, but an acute right sacroiliac joint sprain.   *Id*.   He gave Sample a Kenalog

injection and continued the MS Contin and Flexeril.   *Id*.   Sample's back pain continued,

prompting a Toradol injection in mid-May 2009 and continuation of his prescriptions for MS

Contin and Vicodin.   Tr. 516.   By late June 2010, Sample was still taking about 60 Vicodin a

month, but could no longer afford the MS Contin.   Tr. 563.

   During the year preceding his onset date, Sample continued treatment for his ongoing

mental health issues.   In the summer and fall of 2009, Sample continued to take Wellbutrin and

Citalopram and reported doing better with less depression and more activity.   Tr. 579-80.   A

7 – FINDINGS AND RECOMMENDATION

similar positive report followed in December 2009.   Tr. 573.   However, by mid-March 2010,

Dr. Boespflug noted moderate depression, prompting another dosage increase in his

antidepressant medications.   Tr. 568.   By late June 2009, the medication regimen was no longer

working, and Sample was feeling more depressed and was experiencing homicidal ideation.

Tr. 563.   Dr. Boespflug discontinued the Wellbutrin and Citalopram and started Sample on

Effexor.   *Id*.

## II.   **After Onset Date**

Sample alleges that he became disabled on July 16, 2010.   On July 14, 2010, two days

before the alleged onset date, Margaret Malsch, L.C.S.W., performed a mental health assessment

and diagnosed Sample with major depression, recurrent, with possible psychotic features, alcohol

abuse, post-traumatic stress disorder ("PTSD") from childhood sexual abuse, and assessed a GAF

of 45 to 50.[3]   Tr. 341.   She recommended counseling sessions one to two times a month for six to

eight months.   Tr. 342.

On July 22, 2010, Sample reported to Cameron McCoin, M.D., that his right knee had

"doubled up backward" at work three days earlier and that he felt squeezing and throbbing in his

ankle and foot.   Tr. 560.   His chronic back pain was "different: stiff and painful to move."

Tr. 561.   Dr. McCoin prescribed Prednisone and rest.   *Id.*   Five days later, Sample reported that

he had been unable to work and continued to have right lower back pain.   Tr. 558.   Dr. Boespflug

assessed back muscle spasm, "probably a sprain," told him to stay off work through August 2, and

prescribed Valium and Diazepam.   *Id.*   On August 2, 2010, he was released to work with no

lifting over ten pounds for a week.   Tr. 556.

On August 3, 2010, Sample went to the emergency room with lower back pain which had

---

3  *See* note 2.

exacerbated over the preceding two weeks with episodes of vertigo.    Tr. 366.    Sample described

his pain as aching and not radiating to his legs.    *Id.*    He had mild muscle spasm and soft tissue

tenderness.    Tr. 367.    He was given a note for three days off work and told to follow up with his

primary care physician if not better by then.    *Id.*

By August 13, 2010, Sample had lost his job due to being unable to do his work due to back

pain.    Tr. 514.    Sample wanted to lose weight and reported occasional, but tolerable, vertigo.    *Id*.

Dr. Myo Naing, M.D., assessed morbid obesity, chronic back pain at nine on a ten-point scale, and

depression, and prescribed a month long trial of Diethylpropion for weight loss.    *Id.*

In mid-September 2010, Sample asked Dr. Naing for a medical marijuana card to relive his

pain, in lieu of prescription pain medication which he could not afford.    Tr. 512.    Dr. Naing

continued the weight loss medication and later that month approved Sample's request for medical

marijuana.    Tr. 510, 512.

Sample was seen in the emergency room on October 6, 2010, for chronic recurrent lower

back strain.    Tr. 365.    On October 19, 2010 Dr. Naing gave Sample a Dilaudid injection for his

acute back pain with muscle spasm.    Tr. 504.    On October 22, 2010, Sample reported back pain

at seven on a ten-point scale, was feeling stressed due to losing his job, and stated that he could not

afford his pain medication and smoked marijuana for pain relief.    Tr. 502.    Dr. Naing prescribed

Lexapro for depression and stress.    *Id*.

At appointments in December 2010 and January 2011, Sample continued to struggle with

back, ankle, and knee pain, prompting another Dilaudid injection and samples of Arthrotec

(NSAID), followed by a referral to the orthopedic clinic.    Tr. 487, 500.    During that same time

period, Dr. Naing diagnosed Sample with diabetes, prescribed Metformin, and referred Sample to

the weight loss surgery clinic, the sleep study center, and to diabetes counseling.    Tr. 487, 490-92.

9 – FINDINGS AND RECOMMENDATION

At a diabetes education session on January 14, 2011, Sample again expressed his desire to lose weight, but stated that he had no insurance and his wife's insurance would not cover lap-band surgery.   Tr. 417.   Sample agreed to join a gym and attend water aerobics three times a week as that was "about the only activity he can tolerate [without] back pain."   *Id*.   Sample was "homicidal," prompting the provider to question whether he was taking antidepressants and recommend mental health counseling.   *Id*.

Because Sample reported increasing knee pain in January 2011, Dr. Naing referred him to the orthopedic clinic.   Tr. 487.   On February 8, 2011, Sample reported aching back pain, an inability to sit or stand for very long, and a need for frequent positional changes.   Tr. 484. Dr. Naing gave him a Dilaudid injection.   *Id*.

At the request of the state agency, Brian A. Daskivich, Ph.D., conducted a Psychodiagnostic Interview of Sample on February 17, 2011.   Dr. Daskivich considered Sample's reliability to be "questionable given the significant vagaries of his accounting and some inconsistencies."   Tr. 383.   He also noted that with "no prior direct provider records to review, his clinical presentation is enigmatic."   *Id*.   He concluded:

> Taken together, the above factors are viewed as limitations to effective personal, social and occupational functioning.   The claimant's account suggests a history of addressing perceived interpersonal problems through violent means, with a good deal of reported violent ideation and distressing, unwanted traumatic recollections at present.   This history combined with his substance use history and continued use of (and access to) pain medications and alcohol makes for a heightened risk of potential violence to self or others.   Presently, it is difficult to envision his current psychological, emotional, social, personal and occupational functioning improving without more active and comprehensive psychiatric and substance-use related assessment and intervention.

Tr. 384.

10 – FINDINGS AND RECOMMENDATION

Dr. Daskivich diagnosed Sample with Alcohol Dependence, Sustained Partial Remission; Anxiety Disorder, NOS; Depressive Disorder, NOS; History of Methamphetamine and Cocaine Abuse; rule out PTSD, rule out Opioid Related Disorder, NOS; rule out Other/Unknown Substance Use Disorder, NOS; rule out Pain Disorder, Associated with Psychological Factors; rule out malingering.   *Id.*   He also assessed a GAF of 25-30.[4]

On April 25, 2011, Martin Kehrli, M.D., reviewed Sample's medical records, including the reports from Drs. Daskivich and Watanabe.   Tr. 93-104.   He concluded that Sample was not disabled and discounted Dr. Daskivich's contrary opinion on the basis that Sample was the only source of information available to Dr. Daskivich.   Tr. 99.

On September 20, 2011, Dr. Naing completed a form in which he opined that Sample had depression and agitation from April 1, 2010, until the present and that his limitations would continue for at least 12 months.   Tr. 394-97.   Dr. Naing checked boxes indicating Sample had anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, suicidal ideation, and hallucinations or delusions.   Tr. 394.   He also checked boxes indicating that Sample had marked restrictions of daily living and extreme limitations in maintaining social functioning.   *Id.*   In addition, Dr. Naing found Sample to be markedly impaired in his ability to perform activities within a schedule, to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration, the ability to work in coordination or proximity to others, the ability to complete a normal work day and work week without interruption from psychologically based symptoms, the ability to accept instruction, the ability to get along with coworkers without

---

4  *See* note 2.   A GAF score of 21-30 indicates that:   "Behavior is considerably influenced by delusions or hallucinations *or* serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) *or* inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)."   DSM-IV-TR at 34.

distracting them or exhibiting behavioral extremes, the ability to maintain socially appropriate

behavior, and the ability to set realistic goals.   Tr. 395-96.   He also found Sample to be extremely

impaired in the ability to interact appropriately with the general public.   Tr. 396.

On the same day, Dr. Naing completed another form regarding Sample's physical

limitations and opined that Sample can stand for 15 minutes at a time and no more than two hours

in a workday, and sit for 30 minutes at a time and no more than four hours in a workday.   Tr. 398.

Dr. Naing indicated that Sample has severe pain, must elevate his legs occasionally, and has

drowsiness and constipation from his medications.   Tr. 399.

On September 23, 2011, Sample reported that he had stopped taking his diabetes

medication because it caused kidney pain.   Tr. 482.   Dr. Naing noted Sample was frustrated,

agitated, and angry, and prescribed Glipizide and Diazepam for agitation.   *Id.*   Because the

Diazepam was not working, a week later Dr. Naing prescribed Haloperidol and advised Sample to

try to calm down and not to hurt anyone.   Tr. 480.   Due to continuing agitation and anger, on

October 10, 2011, Dr. Naing prescribed Depakote and counseling.   Tr. 477.

From late 2011 and into 2012, the record reveals ongoing efforts to control Sample's

diabetes and to address Sample's ongoing psychological issues.   Tr. 408-10, 466, 473-74.   By

February 2012, Sample was not taking his medications because he could not afford them, was

depressed, and in pain.   Tr. 463.

From February through early October 2012, Sample received mental health counseling.

Tr. 42, 418-49.   At an intake appointment on February 9, 2012, Penny Johansson, L.C.S.W.,

diagnosed major depressive disorder, chronic, severe; rule out PTSD; anxiety disorder , NOS; rule

out social phobia; and history of alcohol dependence, and assessed a GAF of 44.[5]   Tr. 439.   The

sessions over the following months seemed helpful, but Sample's insurance covered only a limited

number of visits and the clinic closed.   Tr. 448.

On April 19, 2012, Sample was again seen in the emergency room for acute back pain and

muscle cramps and received pain medications, muscle relaxers, and an injection of Dilaudid.

Tr. 460-61.   By the end of the month, Sample's counselor reported that Sample was weeping and

desperate about not being able to provide for his family and had suicidal and homicidal ideation.

Tr. 428.   She noted that he was obsessively worrying, anxious, had "social anxiety issues and

almost panic disorder when it comes to leaving his house" and was "obviously in emotional

anguish."   *Id.*

On May 15, 2012, Dr. Naing noted that Sample's diabetes was uncontrolled because he

thought he did not need the medication and did not take it.   Tr. 457.   One week later Sample

reported to the diabetes educator uneven sleep patterns, often not rising until afternoon, when he

ate one meal for the day.   Tr. 404.   He had reduced his portion size, improved his diet, and was

exercising in a pool twice a week, but could not "walk or do any other kind of exercise because of

back and knee pain."   Tr. 404-05.   The educator noted that Sample was "much better emotionally

at this visit."   Tr. 405.

On May 24, 2012, Ms. Johannson noted that Sample was making progress and had lost 30

pounds.   Tr. 426.   Sample was tearful with "pent up emotional pain."   *Id.*   On June 7, 2012,

Ms. Johannson noted good effort and improved mood, though Sample easily fell into despair with

small set-backs.   Tr. 425.   On June 28, 2012, Sample was in a better mood, but had some dizzy

spells.   Tr. 423.   On July 9, 2012, Sample appeared "slightly less depressed," but complained of

---

5   *See* note 2.

extreme fatigue.   Tr. 421.   Sample had stopped taking his diabetes medication because he believed it caused pain in his side.   *Id.*   On July 30, 2012, Sample reported difficulties with his father-in-law and was grateful for the counseling.   Tr. 419.   In her discharge summary dated October 4, 2012, Ms. Johannson diagnosed Sample with PTSD with symptoms of social phobia and chronic anxiety and assessed his GAF as 52.[6]   Tr. 448.

On November 29, 2012, Cameron Derbyshire, P.A., helped Sample complete paperwork for state assistance, but "was unable to certify for permanent disability," explaining:

> Examination for permanent disability should be done by a physician.   At this time, also mentioned that the time frame that he will be unable to be employed is to be determined; left this open for future review with his PCP once patient establishes with him at that time.

Tr. 549.

Ms. Derbyshire also discussed with him "getting his diabetes in much better control" so that "he will be able to lose weight, improve his depressive symptoms and hopefully gain some increased mobility and be able to find at least part-time employment."   Tr. 550.

On December 10, 2012, Sample's care was transferred from Dr. Naing to Aaron Holmes, M.D.   Tr. 544.   Dr. Holmes described Sample's lumbar degenerative disk disease as "overall, fairly mild" and appropriately treated by Sample with Hydrocodone up to a "max dose of 3 pills a day . . . on an as needed basis."   Tr. 545.   Sample also reported right temple headaches for one to two days every other week and a disrupted sleep cycle.   Tr. 546.

In a letter dated January 7, 2013, Dr. Holmes stated that Sample "does have objectively demonstrated orthopedic injuries that combine to substantially decrease his ability to work in a

---

6   *See* note 2.   A GAF score of 51-60 indicates that the patient has "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."   DSM-IV-TR at 34.

competitive work environment."   Tr. 636.   He summarized the objective medical evidence,

noting that Sample's knee and back conditions are "expected to worsen over time," and concluded

that Sample's conditions imposed the functional limitations of a decreased ability to lift with

bended knees and a decreased ability to sit or stand "for prolonged periods of time repetitively on a

regular schedule."   Tr. 637.

## ALJ FINDINGS

The ALJ applied the sequential disability determination process described above.   At step

one, the ALJ found Sample has not engaged in substantial gainful activity since the alleged onset

date of July 16, 2010.   Tr. 12.

At step two, the ALJ found Sample had the severe impairments of degenerative disc

disease of the lumbar spine, degenerative joint disease/arthritis of the bilateral knees, obesity,[7]

anxiety disorder NOS/depression, sleep apnea, insulin dependent diabetes mellitus, polysubstance

abuse disorder in remission, and status post hernia repair.   *Id.*

At step three, the ALJ concluded that Sample's impairments do not meet or equal the

criteria for any condition in the Listing of Impairments, 20 CFR Pt. 404, Subpt. P, App. 1.   *Id.*

He then found that Sample had the RFC to perform light work, except he can never climb ladders,

ropes, or scaffolds, can frequently balance but can only occasionally climb ramps and stairs, stoop,

kneel, crouch and crawl, must avoid concentrated exposure to workplace hazards such as

dangerous moving machinery or heights, cannot work with the general public, and can have

frequent but not constant contact with supervisors and co-workers.   Tr. 14.

At step four, the ALJ concluded Sample was unable to perform his past relevant work.

---

[7] Sample's height and weight corresponds to a body mass index of 47.7 which the ALJ considered to be Level III or "extreme" obesity.   Tr. 15 (citation omitted).

Tr. 18.   However, at step five, the ALJ found jobs exist in significant numbers in the national

economy that Sample can perform, including three sedentary occupations of patcher, taper, and

polisher.   Tr. 19.   As a result, the concluded that Sample has not been disabled from July 16,

2010, through the date of his decision.   *Id.*

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record.   42 USC § 405(g);

*Garrison v. Colvin*, 759 F3d 995, 1009 (9th Cir 2014) (citations omitted).   This court must review

the record as a whole and weigh both the evidence that supports and the evidence that detracts

from the ALJ's conclusions.   *Garrison*, 759 F3d at 1009-10; *Orn v. Astrue*, 495 F3d 625, 630 (9th

Cir 2007) , quoting *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007).   The reviewing

court may not substitute its judgment for that of the Commissioner.   *Garrison*, 759 F3d at 1010,

citing *Connett v. Barnhart*, 340 F3d 1172, 1174 (9th Cir 2000).   Where the evidence is susceptible

to more than one rational interpretation, the Commissioner's decision must be upheld if it is

"'supported by inferences reasonably drawn from the record.'"   *Rounds v. Comm'r of Soc. Sec.

Admin.*, 795 F3d 1177, 1182 (9th Cir 2015), quoting *Molina v. Astrue*, 674 F3d 1104, 1111 (9th Cir

2012).   However, the court "may not affirm simply by isolating a 'specific quantum of

evidence.'"   *Ghanim v. Colvin*, 763 F3d 1154, 1160 (9th Cir 2014), quoting *Hill v. Astrue*, 698 F2d

1153, 1159 (9th Cir 2012).

## FINDINGS

Sample contends the ALJ erred by:   (1) finding him less than fully credible; (2) rejecting

the opinions of his treating physicians; and (3) formulating an inaccurate RFC.   As discussed

below, this court agrees.

16 – FINDINGS AND RECOMMENDATION

## I.  **Claimant's Credibility**

### A.  **Legal Standard**

The ALJ is responsible for determining credibility, resolving conflicts in medical

testimony, and for resolving ambiguities.   *Garrison*, 759 F3d at 1010, quoting *Andrews v.*

*Shalala,* 53 F3d 1035, 1039 (9th Cir 1995).   The ALJ's findings, however, must be supported by

specific, cogent reasons.   *Reddick v. Chater,* 157 F3d 715, 722 (9th Cir 1998); *Brown-Hunter v.*

*Colvin*, ___ F3d ___, 2015 WL 4620123, at *5 (9th Cir August 4, 2015).

In deciding whether to accept a claimant's subjective symptom testimony, "the ALJ

engages in a two-step analysis."   *Molina*, 674 F3d at 1112.   First, the ALJ must determine

whether there is "objective medical evidence of an underlying impairment which could reasonably

be expected to produce the pain or other symptoms alleged."   *Id* (citations and internal quotation

marks omitted).   If there is such objective evidence and no evidence of malingering, then the ALJ

must give "specific, clear and convincing reasons" in order to reject the claimant's testimony about

the severity of the symptoms.   *Id* (citations and internal quotation marks omitted).   "'General

findings are insufficient; rather, the ALJ must identify what testimony is not credible and what

evidence undermines the claimant's complaints.'"   *Ghanim*, 763 F3d at 1163.   Credibility

findings "'must have support in the record, and hackneyed language seen universally in ALJ

decisions adds nothing.'"   *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F3d 1090, 1103 (9th Cir

2014), quoting *Shauger v. Astrue*, 675 F3d 690, 696 (7th Cir 2012) (remaining citation omitted).

Instead, the evidence upon which the ALJ relies must be substantial, and the ALJ must make

findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily

discredit the claimant's testimony.   *Brown-Hunter*, 2015 WL 4620123, at *5; *Thomas v.*

*Barnhart,* 278 F3d 947, 958 (9th Cir 2002); *Holohan v. Massanari*, 246 F3d, 1195, 1208 (9th Cir

2001); *Reddick*, 157 F3d at 724.

**B.  Sample's Testimony**

Sample testified at the hearing that he last worked for four or five months as an assistant manager at a Dollar Tree store.   Tr. 39, 41.   He was terminated after he hurt his back unloading a truck and was taken off work for a month.   Tr. 40.

At the time of the hearing, Sample was 5'8" tall, weighed 314 pounds, and was losing weight while working to control his diabetes.   Tr. 42.   Although he had been taking insulin for about two months and working on his diet, his diabetes was still out of control.   Tr. 46, 52-53. He previously took Glipizide and Metformin for his diabetes, but they caused pain in his side. Tr. 46, 544.

Sample testified he has constant pain in his back.   Tr. 55.   He regularly takes Hydrocodone and is prescribed up to eight per day for pain.   *Id.*   On a good day, when his pain is "not bothering [him] so bad" and with the Hydrocodone, his pain is a six on a ten-point scale; otherwise, his pain is a ten.   Tr. 55-56.   Sample estimated his average back pain to be six or seven and his average knee pain to be five to six.   Tr. 56.   His recent weight loss has not made much difference.   *Id.*

Sample's combined musculoskeletal impairments limit him to standing in one position for 20 to 30 minutes if he can move his feet, before requiring a 10 to 15 minute break to sit down and rub his feet to improve the circulation.   Tr. 57.   He can sit for 30 to 40 minutes before his back and feet go numb, when he "generally stand[s] up and t[ries] to lean against the wall" for ten minutes before sitting again.   *Id.*   He can walk for about one half of a block before his feet start hurting.   Tr. 58.   Walking in tennis shoes or boots is "like walking on needles," so he generally wears sandals.   Tr. 53.   He can "walk on the sides" of his feet "for about an hour" then can

"usually tolerate standing on them for a little bit."   *Id*.   His legs "give out" and his "knees try to fold backwards."   *Id*.

Sample tries to help his wife around the house with the laundry and dishes, but experiences pain with bending down, standing, and sitting."   Tr. 49.   He pulls the laundry out of the dryer as quickly as he can because it hurts to bend over.   Tr. 66.   He folds the laundry while sitting. Tr. 67.   Sample used to love hunting and camping, but now does that "not so much."   *Id*.   He can no longer bowl with his teenage son.   Tr. 50.

Sample has sleep apnea and uses a CPAP machine.   Tr. 61.   He also takes a sleeping pill and uses Nyquil when he becomes anxious.   *Id*.   His ability to sleep fluctuates, and he is tired most of the time.   Tr. 62-63.   The quality of his sleep interferes with his ability to pay attention, focus, and concentrate, on and off during the day, about six days a week.   *Id*.

Sample struggles with depression for which he takes Citalopram.   Tr. 64.   His depression on an average day is eight on a ten-point scale.   *Id*.   The depression makes him feel like a failure and that his family would be better off if he were not around.   Tr. 65.   Depression causes him problems with attention, focus, and concentration.   *Id*.   He has trouble getting along with other people and his family.   Tr. 66.

Sample explained that he is not able to work because it is difficult for him to focus, keep things straight in his head, and deal with people.   Tr. 67.   He believes that if working he would have a hard time staying on task, and pain would be distracting.   *Id*.   About once a week he "can't get out of bed."   Tr. 68.   When he doesn't sleep, he becomes angry and mean.   Tr. 69.   If working, he believes he would call in sick at least twice a month.   *Id*.   Sample testified that his symptoms would be worse if working, and that he would have a work pace approximately 15% slower than co-workers.   Tr. 70.   He would have trouble dealing with co-workers, the public and

19 – FINDINGS AND RECOMMENDATION

supervisors.   *Id.*

### C.   <u>Analysis</u>

There is no affirmative evidence in the record that Sample is malingering.   Thus, the Commissioner's reasons for rejecting his testimony must be clear and convincing. [8]   *Reddick*, 157 F3d at 722.   The ALJ found that Sample's statements as to the severity of his impairments were "not entirely credible for the reasons explained in this decision."   Tr. 15.   Although the ALJ did not further specify those reasons, the Commissioner cites four such reasons.

First, the ALJ stated that "there is no evidence in the record to support" Sample's assertion on his Function Report dated January 6, 2011, "that his knees buckle and his right ankle gives out." Tr. 14, 224.   However, the medical record contains Sample's report in September 2009 to Dr. Watanabe that his knees "want to hyperextend."   Tr. 304-05.   In addition, Dr. Holmes wrote in January 2013 that Sample "actually does have greater than expected laxity in his right knee on anterior drawer testing.   Given that there is no ACL tear present, there is no particular operative intervention that would improve this and it is objective evidence that is consistent with his clinical subjective symptoms of knee instability as well."   Tr. 636.   Therefore, contrary to the ALJ's statement, there is evidence in the record supporting Sample's assertion on his Function Report.

Second, the ALJ found that Sample's subjective complaints were not entirely credible based on the objective medical evidence describing his impairments as "mild" and on references in the medical record to Sample experiencing only "mild distress."   Tr. 15.   As discussed in detail below, the ALJ erred by rejecting the opinions of Sample's treating doctors regarding the intensity of Sample's symptoms related to his musculoskeletal impairments.   For the same reason, these chart entries are not a clear and convincing reason to reject Sample's subjective symptom

---

8   Although the Commissioner disagrees with the law in the Ninth Circuit, this court is bound to follow it.

testimony.

Third, the ALJ points to an alleged inconsistency, stating that Sample "takes pain medication as needed and does not take it if not in pain, despite his subjective reporting and testimony."  Tr. 15.  Apparently this refers to Dr. Holmes's December 10, 2012 chart note (Tr. 545) that Sample's prescription for "hydrocodone/acetaminophen . . . [r]ecently . . . was decreased to a maximum of 3 [rather than 4] pills a day" which Sample takes "on an as needed basis and does not take it if he is not having much in the way of back pain."  Tr. 545 (Ex. 22F/8, cited at Tr. 15).  True enough, at least the pills per day referenced in the chart note ("maximum of 3") is arguably inconsistent with Sample's hearing testimony that he is "allowed to take up to eight a day as needed for pain."  Tr. 55.  However, Sample's inability to recite the exact dosing prescribed is documented in the record and, therefore, is not a legitimate reason to discredit his subjective pain testimony.[9]

Moreover, the critical portion of Sample's testimony is not the exact number of pain pills he is prescribed (the apparent "inconsistency" identified by the ALJ), but the efficacy of his medications in relieving his pain and the resulting effect on his employability.  *See Warre*, 439 F3d 1001, 1006 (9th Cir 2006); *see also* 20 CFR §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv) (Commissioner will consider the effectiveness of medication in evaluating the severity of an impairment); SSR 96-7P, 1996 WL 374186 at *3 (July 2, 1996).  Importantly, the chart note does not say that Sample is occasionally "*not in pain*" as paraphrased by the ALJ.  Instead the chart note says that Sample chooses not to take pain medications "if he is *not having much* in the way of back pain."  Tr. 545 (emphasis added).  Sample quantified the average amount of back pain he

---

9   According to Dr. Daskivich, Sample "reported that his current medications include: metformin for diabetes but could not recall the dose; morphine 30 mg and hydrocodone – acetaminophen 10/325 'for pain' which he takes several times per week, but could not describe the frequency of dosing."  Tr. 380.

experiences (even with pain medication) as a six or seven on a ten-point scale and takes the pain medications when he experiences pain of ten.   The medical record is replete with reports by Sample that he takes pain medications only as needed[10] and that his pain fluctuates day to day. Tr. 366-67, 460, 484, 500, 502, 504, 506, 515, 556, 558, 563, 565, 567, 579, 583, 591.   Though fluctuating in intensity, Sample's pain is constant and, with or without the medications, results in significant limitations impinging on his ability to maintain competitive employment.   Whether regarding the exact number of pain pills prescribed or the fluctuations in pain levels experienced by Sample, the ALJ fails to identify any material inconsistency that justifies discrediting Sample's subjective pain testimony.

Fourth, the ALJ referred to a note by a physician in October 2012 regarding Sample's depression that he "seems to be doing fairly well."   Tr. 16, 455.   However, the ALJ ignored a note the very next month that Sample's depression had increased.   Tr. 450.   Although he reported some lessening of symptoms with the benefit of counseling in early 2012, his insurance only covered a limited number of sessions.   Tr. 448.   One instance of lessened depression is not a clear and convincing reason to find Sample less than fully credible, especially when his depression is consistently diagnosed as chronic.   In addition, Sample's testimony that his depression averages about eight on a ten-point scale is consistent with the medical record and multiple medication changes.   Tr. 64, 287, 334, 379-84, 421, 425-26, 428, 430, 432, 439, 466, 477, 479, 482, 502, 563, 584, 588, 591.   The record as a whole reveals that Sample struggles with a constellation of chronic mental and physical impairments which wax and wane in severity, but which present him with daily challenges.

---

10   Another entry in the record indicates that Sample also tried to avoid taking any kind of antidepressant medications due to concerns over the side effects.   Tr. 380.

In sum, nothing in the record suggests malingering and, to the degree the ALJ articulated any reasons to reject Sample's testimony, the reasons given do not meet the required standard to find Sample less than fully credible.

## II.  Opinions of Treating Physicians

Sample also contends that the ALJ erred by rejecting the opinions of his treating physicians, Drs. Naing and Holmes.   Dr. Naing treated Sample from March 2010 through mid-May 2012.   Tr. 456, 517.   In September 2011, Dr. Naing completed medical statements regarding both Sample's depression and his physical limitations and abilities.   Tr. 394-99.   In mid-December 2012, Sample began treatment with Dr. Holmes (Tr. 544) who submitted a letter regarding Sample's impairments dated January 7, 2013.   Tr. 636-37.

### A.  Legal Standard

Disability opinions are reserved for the Commissioner.   20 CFR §§ 404.1527(e)(1); 416.927(e)(1).   The weight given to the opinion of a physician depends on whether it is from a treating physician, an examining physician, or a non-examining physician, the extent to which the opinion is explained, and whether the physician is giving an opinion in his or her area of specialty:

> Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's.   In addition, the regulations give more weight to opinions that are explained than to those that are not, and to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists.

*Holohan*, 246 F3d at 1202 (internal citations omitted).

Factors relevant to assessing the level of deference afforded a treating physician's opinions include the length of the treatment relationship, the nature and extent of the treatment relationship, the evidence that supports the opinion and the quality of the explanation provided, the consistency

23 – FINDINGS AND RECOMMENDATION

of the medical opinion with the record as a whole, the specialty of the physician providing the opinion, the degree of the physician's understanding of the evidentiary requirements of the Social Security disability program, and the degree of the physician's familiarity with other information in the record.  *Orn*, 495 F3d at 631 (citations omitted).

If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  *Id* at 632, citing *Reddick*, 157 F3d at 725 (remaining citations omitted) (treating physician); *Widmark v. Barnhart*, 454 F3d 1063, 1067 (9th Cir 2006) (examining physician).   Even if one physician is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  *Orn*, 495 F3d at 632; *Widmark*, 454 F3d at 1066.   The opinion of an nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  *Widmark*, 454 F3d at 1066 n2 (citation omitted).   However, it may serve as substantial evidence when it is supported by and consistent with other evidence in the record.  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 600 (9th Cir 1999).

## B.   Dr. Naing's Opinion

Dr. Naing opined on September 20, 2011, that Sample suffered from multiple mental and physical limitations that would preclude competitive employment.  Tr. 394-99.   The ALJ gave Dr. Naing's opinion "very little weight" because the "checkbox forms grossly overstate objective evidence and associated functional limitations; there is no basis for the limitations in the medical evidence of record, and they are contradicted by the actual objective medical evidence."   Tr. 16.

The ALJ may reject a treating physician's opinion that is "brief, conclusory, and inadequately supported by clinical findings."   *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir

24 – FINDINGS AND RECOMMENDATION

2005), citing *Tonapetyan v. Halter*, 242 F3d 1144, 1149 (9th Cir 2001).   By simply checking

boxes on forms, Dr. Naing's opinions are indeed brief.   However, the ALJ failed to explain why

he found those opinions to be inadequately supported by clinical findings or how they "grossly

overstate" and "are contradicted by" objective medical evidence.   The ALJ stated only that

"[d]espite [Sample's] history of noncompliance and only mild objective findings," Dr. Naing

filled out the form assessing "severe functional restrictions."   Tr. 16.   As discussed below, those

are not specific and legitimate reasons.

     Sample has a long history of chronic back and knee pain beginning in as early as 2004

which has been diagnosed and treated by multiple medical providers, including Dr. Naing.   To

cast doubt on the severity of that pain, the ALJ relied on a few references to "mild" in the medical

record.   Acknowledging the diagnosis of lumbar degenerative disc disease in 2008, the ALJ noted

that it showed "only mild abnormalities on imaging" and was described by Dr. Holmes "as fairly

mild in a late 2012 note."   Tr. 15, citing Tr. 371, 330 (MRI), 545.   The ALJ also pointed out that

Sample "takes pain medication as needed and does not take it if not in pain, despite his subjective

reporting and testimony."   *Id*.   He also chastised all of the treating physicians by adding:

"Despite mild objective findings and several mentions of 'mild distress' regarding low back pain,

[Sample's] primary providers have continued to prescribe narcotics."   *Id*.

     It is far from clear why the ALJ concluded that Sample's back pain was only mild and did

not require treatment with narcotic medications.   None of the treating physicians came to that

conclusion or described Sample as malingering, and some expressly described his pain as "acute,"

"sharp," and "severe."   Tr. 279, 365, 460-61, 484, 500, 504, 506, 510, 558, 585.   As discussed

above, the ALJ incorrectly paraphrased Sample's use of pain medications, implying that there are

times when he is "not in pain," while the overwhelming evidence in the record indicates that his

pain is constant, though varying in severity and somewhat reduced with the use of narcotic pain medications.   Although Dr. Holmes referred to the lumbar degenerative disk disease as "fairly mild," at the same time he felt that it was appropriate for Sample to take Hydrocodone and acetaminophen on an as needed basis to relieve his pain.   Tr. 545.   He later explained in his January 7, 2013 letter that, Sample had "an abnormal MRI" in 2008 with "fairly mild" bulging that was "not impinging on any nerve roots."   Tr. 636.   Nonetheless, he opined that Sample may have "some degree of annular tear that is contributing to his back pain" based on "a decreased reflex" on his more symptomatic right leg.   Tr. 636-67.   He also stated that Sample "does have facet joint hypertrophy at the L4-L5 level."   Tr. 637.   In other words, the mild abnormalities in the MRI do not equate to mild pain and may produce the severe pain consistently reported by Sample to his medical providers.

The ALJ also criticized Dr. Naing for ignoring Sample's "history of noncompliance." Tr. 16.   The ALJ described that "history of noncompliance" as relating to Sample's "diabetes medication" which he failed to take for a period of time and "diet instructions" in which "he was not interested."   *Id*.   Although not expressly stated, it appears the ALJ believed that Sample's back and knee pain was caused by his morbid obesity and that if he simply complied with the advice of his medical providers to lose weight, his pain would lessen.   The unexpressed role of obesity to the ALJ's decision is bolstered by his reference to Ms. Derbyshire's refusal in November 2012 to certify total disability and advice to Sample to control his diabetes "so that he can lose weight and improve depressive symptoms; he would gain mobility and be able to find at least part-time employment."   Tr. 16, citing Ex. 22F, p. 13.

As the ALJ acknowledged, "obesity can cause, complicate or contribute to impairments in the musculoskeletal system" and must be considered "alone or in combination with his other

impairments" to determine the RFC.   Tr. 15, citing SSR 02-1P, 2002 WL 34686281 (September

12, 2002).   However, "[b]efore failure to follow prescribed treatment for obesity can become an

issue in a case, we must first find that the individual is disabled because of obesity or a

combination of obesity and another impairment(s)."   SSR 02-1P, 2002 WL 34686281, at *9.

"Prescribed treatment" is a term of art.   *Orn*, 495 F3d at 637.   The "treatment must be prescribed

by a treating source, . . . .not simply recommended.   A treating source's statement that an

individual 'should' lose weight or has 'been advised' to get more exercise is not prescribed

treatment."   SSR 02-1P, 2002 WL 34686281, at *9.   Moreover, the Commissioner "will rarely

use 'failure to follow prescribed treatment' for obesity to deny or cease benefits."   *Id*.   Instead,

the Commissioner will find a failure to follow prescribed treatment only when three criteria are

satisfied:   (1) the individual has an impairment that meets the definition of disability; (2) a treating

source has prescribed treatment that is clearly expected to restore the ability to engage in

substantial gainful activity; and (3) the evidence shows that the individual has failed to follow

prescribed treatment without a good reason.   *Id*.

A number of chart entries "encourage" weight loss, document Sample's efforts at weight

loss, or suggest that his weight may be contributing to his symptoms (*e.g.*, Tr. 291, 455, 550, 556,

568, 592, 616-17), but only one evidences "prescribed treatment."   In August 2010, when Sample

sought out medical intervention in an effort to lose weight, Dr. Naing prescribed a month long trial

of Diethylpropion to assist Sample with weight loss.   Tr. 514.   Later chart notes indicate that the

drug resulted in "no obvious weight loss" and that Sample could not afford to fill the prescription.

Tr. 502, 512.

Other than the trial period of Diethylpropion, the record reveals no prescribed treatment for

obesity.   Dr. Naing indicated that he would refer Sample to the weight loss surgery clinic for a

27 – FINDINGS AND RECOMMENDATION

possible LAP-BAND procedure.   Tr. 492.   However, later chart notes indicate that, again,
Sample had no insurance coverage for that procedure and could not afford it without such
coverage.   Subsequent chart entries make no mention of prescribed weight loss treatment, despite
referring to obesity.   In his opinion a year later, Dr. Naing lists only Hydrocodone and Flexeril as
prescribed medications and, although he lists morbid obesity as a fourth-level diagnosis after
listing Sample's three musculoskeletal issues (Tr. 398), nothing else in either the medication or
comments section indicates that Dr. Naing believed that weight reduction would significantly
improve his musculoskeletal conditions or recommended any further prescribed treatment for
weight loss for Sample.   Tr. 399.   In short, the record is devoid of evidence that Dr. Naing or any
other treating source prescribed treatment that was clearly expected to restore Sample's ability to
engage in substantial gainful activity and that Sample failed to follow such prescribed treatment.
Thus, the ALJ's observation of a "history of noncompliance . . . with diet instructions" provides no
basis on which discredit Dr. Naing's opinions.

When accusing Sample of being noncompliant with controlling his diabetes, the ALJ
ignored critical parts of the record as to why.   In June 2012, Sample reported he felt hopeless
about controlling his diabetes because his mother had it and was unable to tolerate insulin.
Tr. 401.   He was unable to afford the strips for his blood glucose meter.   Tr. 402.   Prescription
pills for his diabetes caused pain in his side.   Tr. 482.   Sample also reported the lack of support by
his family for healthy eating with a home was full of sweet, salty, and fatty foods.   Tr. 400.   More
importantly, he has very limited financial resources and on multiple occasions reported an inability
to afford his medications.   Tr. 409, 443, 463.   Sample's failure to obtain or follow prescribed
treatment is justifiable based on his inability to afford such treatment.   *Warre*, 439 F3d at 1006;
SSR 82-59, 1975-1982 Soc Sec Rep Serv 793 (January 1, 1982).

28 – FINDINGS AND RECOMMENDATION

The ALJ also criticized Dr. Naing's opinion on Sample's "mental health limitations" as being "outside the physician's area of expertise."   Tr. 16.   Even though Dr. Naing was not a psychiatrist, he observed Sample's mental health state over a period of years for the purposes of both diagnoses and treatment.   More importantly, his opinion is consistent with multiple reports in the medical record of depressive and anxiety symptoms commencing in April 2008 for which Sample received treatment.   Multiple providers noted anxiety, anger management issues, psychomotor retardation, sad or flat affect, failure to make eye contact, depression, homicidal and suicidal ideation, questionable judgment, insomnia, agitation and decreased energy.   Tr. 287-89, 339, 416, 428, 432, 439, 477, 482, 563, 568, 592, 613, 618, 624.   Although many of these records precede the alleged onset date, they "can be relevant, particularly in the case of progressive impairments," as here.   *Rodriguez v. Astrue*, No. CV-11-03083-CI, 2013 WL 500124, at *12 (ED Wash Feb. 8, 2013), citing SSR 83-20, 1983 WL 31249 (1983).   In addition, Sample received mental health counseling for several months in early 2012 until his insurance ran out.   Tr. 419-38. Finally, as explained below, once Dr. Naing's opinions regarding Sample's physical limitations are properly credited, it is clear that Sample should be found disabled without regard to any additional limitations imposed by his mental impairments.   Thus, it is of no moment that Dr. Naing filled out an assessment that is not in his primary area of expertise.

In contrast to the "very little weight" given to Dr. Naing's opinion, the ALJ gave "substantial weight" to the April 25, 2011 reconsideration-level assessment of a nonexamining state physician, Martin Kehrli, M.D., because it was "consistent with the medical evidence and supported by [Sample's] acknowledged level of activity."   Tr. 18, citing Ex. 3A (Tr. 93-104). However, Dr. Kehrli's opinion which was rendered without the benefit of subsequent medical records, including Dr. Naing's well-supported contrary opinion and the counseling records.

29 – FINDINGS AND RECOMMENDATION

In sum, the ALJ failed to articulate specific and legitimate reasons to reject Dr. Naing's opinion in favor of the opinion of Dr. Kehrli, a nonexamining physician.    Accordingly, Dr. Naing's opinion should be credited and the limitations he endorses should be included in Sample's RFC.

**C.   Dr. Holmes's Opinion**

The ALJ gave "very little weight" to Dr. Holmes's opinion that Sample "has orthopedic injuries that substantially decrease his ability to work."   Tr. 16.   In support of this conclusion, the ALJ stated that Sample has had osteoarthritis of the knees which "has been the same for years" and "worked several jobs, including as a prison guard, with the condition."   *Id.*   He also noted that Dr. Holmes's opinion was "vague" and that "the ultimate issue of disability is one reserved" to the ALJ.   *Id.*

Sample did work several jobs with knee pain prior to his alleged onset date.   However, in September 2009, Dr. Watanabe, an orthopedist, stated that Sample's knee problems would probably progress unless he lost weight.   Tr. 305.   As Dr. Watanabe predicted, the knee pain did progress, resulting in an acute event in July 2010 which contributed to Sample's inability to continue working.   Tr. 560-61.   Contrary to the ALJ's statement, this is a condition that has not been "the same for years," but instead has worsened over time.

The ALJ also erred by describing Dr. Holmes's opinion as vague.   Dr. Holmes listed objective findings that he deemed to be consistent with Sample's subjective complaints and specified that Sample would have functional limitations "imposed by these chronic worsening conditions," including a decreased ability to lift with bended legs and decreased ability to sit or stand for prolonged periods repetitively and on a regular schedule.   Tr. 637.

Because the ALJ failed to articulate specific and legitimate reasons to reject Dr. Holmes's

opinion, that opinion should be credited when assessing Sample's RFC.

## III.  __Remand__

The decision whether to remand for further proceedings or for immediate payment of

benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F3d 1172, 1177-78 (9th Cir

2000).  The issue turns on the utility of further proceedings.  *Id* at 1178.  The court may not

award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is

disabled under the Act.  *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138 (9th Cir

2011).   Under the "crediting as true" doctrine, three conditions must be satisfied in order for a

district court to remand for an award of benefits:

> (1) the record has been fully developed and further administrative
> proceedings would serve no useful purpose; (2) the ALJ has failed to
> provide legally sufficient reasons for rejecting evidence, whether claimant
> testimony or medical opinion; and (3) if the improperly discredited
> evidence were credited as true, the ALJ would be required to find the
> claimant disabled on remand.

*Garrison*, 759 F3d at 1020 (citations omitted).

The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the

court "some flexibility."   *Connett*, 340 F3d at 876, citing *Bunnell v. Sullivan*, 947 F2d 341, 348

(9th Cir 1991) (*en banc*).   That flexibility allows the court "to remand for further proceedings

when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled

within the meaning of the Social Security Act."   *Garrison,* 759 F3d at 1021.

As discussed above, the ALJ erred by finding Sample less than credible regarding the

severity of his symptoms and by rejecting the opinions of treating Drs. Naing and Holmes.

Dr. Naing opined that Sample has even greater limitations in his ability to stand and sit than

Sample himself testified to.[11]   Additionally, Sample's testimony, when properly credited, reveals that he experiences pain and numbness, as well as periods of instability, when walking minimal distances, prompting him to engage in odd adaptive maneuvers in an effort to stave off the pain. *See* Tr. 53 (describing walking "on the sides of his feet" as an adaptive measure and a tendency for his legs to "give out" or his knees to "try to fold backwards").   Moreover, Dr. Holmes opined that Sample has impairments that result in a "decreased ability to sit for prolonged periods of time repetitively on a regular schedule and to stand for prolonged periods of time repetitively on a regular schedule," "substantially decrease his ability to work in a competitive work environment," and "expected to worsen over time."   Tr. 635-36.   The vocational expert testified that if Dr. Naing's opinion regarding sitting, standing, and walking limitations is credited, then Sample would be unable to maintain employment, either light or sedentary.   Tr.76.   Thus, the court should conclude that Sample is disabled based on this medical record and that no useful purpose would be served by a remand of this matter for further proceedings.   *See McCain v. Comm'r of Soc. Sec. Admin*, 2015 WL 859522, at *6 (D Or Feb. 27, 2015) (citations omitted).

## RECOMMENDATION

For these reasons, the Commissioner's decision should be **REVERSED** and **REMANDED** pursuant to Sentence Four, 42 USC § 405(g), for the immediate calculation and payment of benefits to Sample.

///

///

///

---

11   *Compare* Tr. 398 (15 minutes of standing and 30 minutes of sitting at one time per Dr. Naing) and Tr. 57 (standing 20-30 minutes at a time and sitting for 30-40 minutes at a time per Sample).

## <u>SCHEDULING ORDER</u>

The above Findings and Recommendations will be referred to a United States District Judge for review.   Objections, if any, are due October 16, 2015.   If no objections are filed, review of the Findings and Recommendations will go under advisement on that date.

If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendations will under advisement on that date.

Dated this 29th day of September, 2015.


s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge